Welles, J.
The articles of agreement, and the deed given in pursuance thereof, which are sought to be reformed, are for three distinct parcels of land. The articles which bear *321 date September 8,1836, provided for the sale of a quantity of hay and one hundred bushels of oats, together with the three parcels of land; for all of which, the land, the hay, and the oats, the defendant agreed to pay the plaintiff the gross sum of $7500. The deed was executed on the first day of May following, and conveyed the land by the same description as contained in the articles, expressing the same consideration in gross for the same three parcels of land. There is nothing in the case to show what was the particular price or estimate put by the parties upon either of the parcels of land sold, either by the acre or otherwise.
The controversy is in relation to the west boundary of the first parcel mentioned, being the east half of lot number two, in the first township of the Chenango Triangle, which lot number two lay between the Otselic and Tioughnioga rivers, and bounded on the east and west by those rivers.
At an early day, and long prior to November 12th, 1814, this lot was held and owned by the plaintiff and his father, John Johnson, as tenants in common. On the day last mentioned, a division of the lot was made, and the plaintiff, by indenture of that date, released and quit-claimed to his father and five others, being his brothers, the west half of the lot, “ to be divided by a survey thereof made by Salmon Rose. A hemlock is the bounds or corner on the south line, and a stake and stones in the north line of said lot number two, containing two hundred and eleven acres, more or less.” The grantees in the last mentioned indenture, at the same time released and quit-claimed to the plaintiff the east half of the lot, with a similar reference, to Salmon Rose’s survey, and to the hemlock tree and stake and stones, for the north and south corners, and as containing the same quantity of land as the east half.1- Upon this division being made the parties to it'built a. division fence through so much of the lot as was cleared, commencing at the hemlock tree standing in or near the south line and running northerly through the cleared land to the woods, and marked a line in con *322 tinuation of the fence through the woods to the north line ; and thenceforth occupied and held up to that fence and line on each side without dispute, and so continued to occupy, and to cultivate the land on the cleared part of the'lot until the sale by the plaintiff to the defendant, of the east half of the lot.
Such was the condition of things early in September, 1836, when the parties to this suit commenced their negotiation for the purchase by the defendant from the plaintiff, of the east half of the lot. Immediately previous to the purchase, the parties, in company with several other persons, went upon the premises and spent two or three hours in examining them, and with a view to the purchase. The evidence, I think, establishes that on that occasion the plaintiff pointed out to the defendant the boundaries of the land proposed to be sold. That he was shown the hemlock tree as the southern terminus of the division line, and the fence running from thence north to the woods, and he then understood that such fence and a line continued north through the woods to the north line of the lot was the west boundary of that parcel of the land, for the purchase of which he was then in treaty with the plaintiff After agreeing upon the terms of the purchase, the parties went directly from the land in question to the plaintiff’s residence, in the town of Greene, where the articles of agreement were drawn and executed. On that occasion a map of the lot number two was presented by the plaintiff with a division line drawn through it from north to south, with the courses and distances marked on all the lines of both the divisions excepting the east line of the east half, and the west line of the west half, which were the two rivers mentioned; and from this map the attorney who drew the articles drew the description in them of the east half. This map purported to have been made from a survey of the whole lot made by one Burlingame, in 1805.
*323 The defendant afterwards went into possession of the east half of the lot number two under his purchase, occupying up to the division fence mentioned, treating the fence as the true division line between him and the adjoining owners on the west for some two or three years, when he ascertained that his deed from the plaintiff actually embraced some sixteen acres of the land lying west of the division fence and the line in continuation north, and leaving out some eight acres which was included in it. The defendant after-wards brought an action in the common pleas of the county of Broome for a breach of the covenant of seisin contained in the plaintiff’s deed, in relation to that portion of said lot number two, embraced in the deed, lying west of the line of practical location between the east and west parts thereof. The present suit was commenced in the court of chancery to correct the mistake in the deed and to reform the same, and for a perpetual injunction against proceeding in the action of covenant. The supreme court at special term decreed that the east half of said lot number two was sold by the plaintiff and purchased by the defendant upon a view and practical location thereof by the parties, and that the same is bounded on the east by the Otselic river, on the north and south by the north and south lines of the said lot number two, and on the west by the division line of said lot as established by the said plaintiff and the owners of the west half as aforesaid; and that the west line of the said east half, as described in the said deed from the plaintiff to the defendant, was inserted by mistake. The decree directs a survey to ascertain the quantity of land in the east half agreeably to the practical location thereof, and upon ascertaining the deficiency or the quantity of land less than two hundred and eleven acres, three roods and six perches (the quantity which the plaintiff represented to the defendant the east half contained), that compensation be made for such deficiency by the plaintiff to the defendant at the average price which the consideration mentioned in the contract and *324 deed bears to the said quantity of two hundred and eleven acres, three roods and six perches. The general term, on a rehearing, affirmed the first part of the decree at special term, and reversed all that part of it relating to compensation, and decreed costs to the plaintiff of the suit and the rehearing.
I concur with the justice at special term that the premises were sold by the plaintiff and purchased by the defendant, upon a view and practical location thereof. It is quite manifest that the plaintiff did not intend to sell any part of lot number two, west of the practical division line referred to. This is evident from the fact that the line is shown to have been established and recognized by him and the opposite owners as a division line between them for more than twenty years, and he therefore could not convey title to anything west of it; also from the fact that this line was pointed out by him to the defendant as the true west line when they were in treaty for the purchase. The plaintiff’s brothers were in actual possession on the other side, oceu¡oyihg up to the line, and the plaintiff does not appear to have ever made any claim beyond it.
I think it about as clear that the defendant never supposed he was purchasing or contracting for any part of the lot west of this line. Cyrus Johnson swears that the plaintiff told the defendant, when the parties were viewing the premises, and before the purchase, that the line ran from the hemlock tree along the fence and straight through the woods to the north line, and then the north line of the lot run to the Otselic. This the witness repeats on his cross-examination. The witness, Salma Johnson, who owned and was in possession of the land on the south part of the lot, west of and adjoining this line, testifies that, upon the same occasion, he told the defendant that he owned the lot adjoining him: that he seemed readily to know the corner: that his (the witness’s) lot on the division line, and in the southeast corner, was broken up ready for seeding at this *325 time. Another significant fact, tending to the same conclusion, is that, very soon after the purchase, the defendant went into possession of the east part, and occupied up to the line, and performed acts which recognized it as the true line, without objection. Before the purchase, this division fence was divided between the plaintiff and his brother Salma for the purpose of keeping it in repair, and after the defendant came on, the same arrangement was made between him and Salma, the latter keeping up the same half that he did before. A similar arrangement was made by defendant with Franklin Johnson, who occupied another portion of the west part, and adjoining this division fence. It also appears, from the testimony of the defendant’s witness Brown, who was with the parties when they were examining the farm, that they went over the farm in different directions, and examined the boundaries, and saw this division fence, which was understood to be the west line of the farm the defendant was about to purchase. There is other testimony tending to the same conclusion, and nothing that I can discover to rebut it, excepting the description in the articles and the deed. There is no proof in the case to show that the division line marked upon the Burlingame map, from which the description in the articles was drawn, was ever actually surveyed. The practical division was made in 1814, and the map was made from a survey made in 1805. It is probable that the survey was of the entire lot, long before any division thereof, and that the line was drawn across it afterwards upon a mere estimate, and without a further actual survey or measurement. The division deeds of 1814 do not refer to this map or to Burlingame’s survey, but the division was to be according to Rose’s survey. This survey of Rose’s is not in evidence, but the presumption is that the practical division was according to it. It is true the plaintiff furnished the map from which the description was drawn, but there is no reason for supposing the defendant knew anything about where the division line *326 marked upon it would run practically. He undoubtedly supposed, with the plaintiff, that it was agreeable to the practical location and division as it had just before been pointed out and explained to him.
The conveyance should therefore be corrected by the defendant releasing all claim under the covenants in the deed, in reference to any land that it embraces west of the actual practical division line, and by the plaintiff conveying, with covenants similar to those in the deed already given, any part of the said lot number two, lying east of said line, not embraced in the latter deed.
On the subject of compensation, it seems to me there is no ground for claiming it. The sale was what is cabed a sale per aversionm; that is, for a gross sum to be paid for the three parcels of land, without reference to the quantity or number of acres, with the hay and oats. With respect to the east part of lot number two, it was for what was contained within the north and south lines of the lot and the Otselic river on the east, and the division line as shown, and which the previous owners had recognized, on the west, be the quantity more or less. That was what the plaintiff intended to sell, and what the defendant supposed he was buying, and for which, and the other two pieces and the hay and oats, he paid the gross sum of $7,500. That was all he was in justice and equity entitled to, and I can perceive no propriety in compensating him for not getting more.
No fraud on the part of plaintiff is pretended. The misdescription in the articles and deed were purely a mistake, and no one was misled by it. It is said that the plaintiff represented before the sale that the land contained two hundred and eleven acres and rising, and that upon actual measurement it falls short. It was upon this ground that the justice at special term decreed compensation. It seems to me that too much importance is attached to this circumstance. There is no proof in the case, that the plaintiff undertook that the land should contain any particular quan *327 tity or number of acres. The defendant had examined and explored it. The several boundary lines had been pointed out to him ; a loose conversation arose as to the quantity of land; and the witness Brown does say that the defendant proposed to have the farm surveyed and that the plaintiff replied there was no use in having it surveyed, as it would overrun the number of acres marked on the map, as he, the plaintiff, had had it surveyed.
This is the strongest proof on the subject. Brown does not say when this conversation took place, whether at the time the articles were drawn or while they were examining the premises, or at some other time. Cyrus Johnson testifies that a conversation took place between the parties on that subject, the next evening, at his, the witness’s, house. This must have been after the articles were executed; as Brown testifies that the parties went directly from the examination of the farm to Greene, about ten miles, and had the articles drawn and executed there. The conversation which Cyrus speaks of was that something was said by the defendant about having the farm surveyed: that he wanted it surveyed : that plaintiff said he would survey it to him at $25 per acre, or he might take it as it was; that defendant said he wanted to know how much land he had, and wanted it surveyed; that plaintiff said it would hold out more than he told him.
In all this, it is perfectly easy to see that, whatever was said by the plaintiff as to the quantity of the land, nothing more was intended by him than a confident expression of opinion, given in good faith, founded, perhaps, upon the map produced, or upon the Rose survey. If the writings had conformed to this practical division line, most clearly the defendant would have had no claim, legal or equitable, for any deficiency, and if it had contained more than the ' quantity stated, the defendant would have been entitled to it.
I think, therefore, the modification of the decree at the general term was substantially correct, excepting upon the *328 question of costs. It seems to me that neither party should be allowed to recover costs as against the other; the mistake complained of having been produced by the plaintiff, in the first place, and the defendant, having commenced his action at law, to recover what, in equity and conscience, he was not entitled to, the decree at general term should be modified accordingly, and the release of the defendant and conveyance by the plaintiff, before indicated, should be directed.
The whole court concurred,
Judgment accordingly.